10-6517.112-JCD                                                    July 27, 2011

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| FLAVA WORKS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 10 C 6517 |
| | ) |
| MARQUES RONDALE GUNTER d/b/a | ) |
| myVidster.com; SALSAINDY, LLC; | ) |
| VOXEL DOT NET, INC., and | ) |
| JOHN DOES 1-26, | ) |
| | ) |
| Defendants. | ) |

### MEMORANDUM OPINION

Plaintiff, Flava Works, Inc. ("Flava"), is a company that produces and distributes adult entertainment products, including DVDs and streaming video. Flava brought this action against defendant Marques Rondale Gunter, who created, owns, and operates a website called myVidster.com ("myVidster"), and defendant SalsaIndy, LLC, an entity controlled by Gunter that funded the start-up of myVidster.[1] (We will refer to Gunter and SalsaIndy collectively as "defendants.") Flava alleges that myVidster infringes its registered copyrights and trademarks. The Third

---

[1] Flava also sued Voxel Dot Net, Inc. ("Voxel"), a company that is alleged to have provided web-hosting services to myVidster, and John Does 1-26, who are registered users of myVidster. Voxel has provided plaintiff with a sworn declaration that it no longer hosts myVidster, and plaintiff has withdrawn its motion for a preliminary injunction as to Voxel.

- 2 -

Amended Complaint contains several claims for copyright and trademark infringement.

Before the court is plaintiff's motion for a preliminary injunction "to prevent defendants from enabling," through myVidster, the infringement of plaintiff's works. (Pl.'s Mem. at 1.)[2] In its motion, Flava contends it has a likelihood of succeeding on its contributory and vicarious copyright infringement claims.[3] On May 18 and June 9, 2011, we conducted a hearing on plaintiff's motion. The court heard testimony from two witnesses-- Gunter and Philip Bleicher, plaintiff's CEO. We have considered the materials and evidence submitted by the parties[4] and conclude that this is a proper case for issuance of a preliminary injunction pursuant to Federal Rule of Civil Procedure 65.

---

[2] The specific relief sought by plaintiff is discussed at the end of this opinion.

[3] In conclusory fashion, plaintiff asserts in its memorandum in support of its motion that it is likely to succeed on its trademark infringement claims. The trademark-infringement argument is waived because it is undeveloped. At the injunction hearing, plaintiff briefly mentioned its trademark claims in closing argument, and we indicated that we understand the motion to be limited to the issue of copyright infringement. Plaintiff also referred in closing argument to its claims of direct copyright infringement and inducement of copyright infringement, but its motion is not based on those claims. Rather, plaintiff states that its motion is "made on the grounds that Plaintiff is likely to succeed on the merits of its claims for contributory and vicarious copyright infringement." (Pl.'s Mot. at 2.)

[4] We have not, however, considered Phillip Bleicher's affidavit. Defendants previously sought to have portions of the affidavit stricken. We denied the motion, explaining that it was unnecessary; plaintiff did not need to use the affidavit because it was anticipated that Mr. Bleicher would testify at the injunction hearing. He did testify at the hearing, so we have considered his testimony instead of his affidavit.

- 3 -

## *Facts*

Gunter owns and operates myVidster, which he calls a "social video bookmarking" website. MyVidster is Gunter's solo project; he is its only programmer. (Tr. of June 9, 2011 Hr'g (June Tr.) 7.) On myVidster, users can "bookmark" video files. (The parties also refer to this action as "posting.") There are two types of myVidster users: (1) general users, whose memberships are free; and (2) "pro" users, who pay a small monthly ($3 or $5) or yearly ($40) fee for the additional benefit of being able to create and save backup copies of the videos that they post to myVidster. MyVidster has about 80,000 general users and 25 to 30 pro users. Its primary source of revenue is advertising fees; advertisers pay for the number of "impressions" and/or "clicks" that their advertisements receive.

When a user bookmarks or posts a video on myVidster, he essentially directs myVidster to "embed" a video clip on its site. When a user submits a video to be posted on myVidster, myVidster "crawls" the website that hosts the video, gets information about that video file, and creates a thumbnail image of the video if one is not already available.[5] MyVidster then "embeds" the video on its site, allowing it to be displayed there. MyVidster does not simply link to video files displayed on another site; it embeds the files on its own site at the direction of users. In other words,

---

[5] The thumbnail image is hosted on myVidster's servers. (June Tr. 66.)

- 4 -

when a visitor to myVidster clicks on a video that is posted there, the video plays directly on myVidster, and the visitor remains on the myVidster site; he or she is not taken to the site that hosts the video file.

Some of the videos that appear on myVidster are hosted on myVidster's own servers--the "backup copy" videos--but the vast majority of them are hosted on third-party websites. MyVidster displays information about its embedded videos, such as the username of the user who posted the video, the date the user posted the video, the "source link," and the "embed" code. The "source link" displays the URL (uniform resource locator, a unique address for a file accessible on the internet) where the user bookmarked the video. In cases where a myVidster user bookmarks another user's bookmark, the "source code" will be a myVidster URL even though the original file of the video may be hosted elsewhere. As for the "embed" code, it enables the display of the video and signifies its "true source"--the site where the video is hosted. (June Tr. 16.) Some videos that appear on myVidster have an associated "download" button; by clicking the button, users can download a copy of the video to their own computer or storage device.

When a user posts a video, he can "tag" the video with keywords. MyVidster indexes those tags, enabling users to find videos through a keyword search. MyVidster filters videos into two

categories--adult and non-adult. (More than half of the videos that appear on myVidster contain adult pornography.) In order to view adult videos, a website visitor must turn off the "family filter." Besides the adult/non-adult filter, myVidster does not have other filters in place for content posted on the site.

Phillip Bleicher is Flava's owner, CEO, and webmaster. He describes Flava as a "gay ethnic adult company" that produces internet website content, streaming video, DVDs, magazines, and photographs. (Tr. of May 18, 2011 Hr'g ("May Tr.") 13.) He first became aware of myVidster when some of Flava's customers complained about having to pay for its videos when they could get them for free on myVidster. Bleicher then visited myVidster, used its search function to search for Flava's trademarks, such as "Flavamen" and "CocoDorm," and found hundreds of Flava's copyrighted videos displayed on myVidster (without Flava's permission). Bleicher noted that myVidster provides space for comments on videos and that in some of those comments, myVidster users inquired about obtaining more of Flava's content and requested that other users post more Flava videos. Bleicher could see which users had posted Flava's videos and could also see that for some of the videos, the "source link" and/or "embed code" was myVidster itself. Bleicher and his staff took screenshots of many different copyrighted Flava videos as they were displayed on

- 6 -

myVidster at various times in 2010 and 2011, and plaintiff has submitted copies of several of those screenshots.

On May 12, 2010, Flava sent Gunter a "takedown notice" pursuant to § 512 of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512. Flava sent Gunter additional DMCA notices on July 20, August 21, September 22, December 2, December 5, and December 9, 2010.[6] The notices listed specific files and thumbnail images that Flava contended were infringing its copyrights and demanded immediate removal from myVidster. Most of the DMCA notices also specified myVidster users whom Bleicher had identified as "repeat infringers"--i.e., users who have repeatedly posted videos that infringe Flava's copyrights.

Bleicher testified that after he sent Gunter the DMCA notices, Gunter "[s]ometimes would act upon them and remove the content, some of it; sometimes he would remove just the links but not the videos or the embedded thumbnails; and sometimes he leaves some of the content up." (May Tr. 25.) Bleicher elaborated:

> For the most part, [Gunter] left the thumbnails up quite
> often. I kept having to remind him that all of the
> content that I had identified needs to be removed.
> Sometimes he removes the thumbnails still, sometimes he
> doesn't. Sometimes he removes the links we identify,
> sometimes he doesn't. Sometimes, you know, he leaves--he
> keeps pointing out that these files are elsewhere, but
> they are clearly on myVidster.

_____

[6] In addition to these notices that are referred to in the complaint and were sent via U.S. mail and e-mail, there was at least one additional DMCA notice that was sent by e-mail (and perhaps U.S. mail as well; it is unclear) on October 18, 2010. In 2011, plaintiff also sent defendants a number of DMCA notices.

- 7 -

. . .
Q. Has he ever removed any of the thumbnails?
A. He has removed some of them, but it's a painstaking
process that we keep identifying when we give him links
to remove and then he doesn't remove all of the links or
doesn't remove all of the thumbnails or the videos.
Q. So some of the thumbnails are still up [on
myVidster]?
A. Yes, they are.

(May Tr. 26-27.) The amount of time it took for Gunter to remove

the infringing content varied, but it was "more than a few days,"

according to Bleicher. (May Tr. 25-26.) (Gunter, on the other

hand, testified that he removed material identified in the notices

within twenty-four hours of receipt of the notice.)[7] Moreover,

although Gunter was in frequent contact with Bleicher regarding the

repeat infringers that Flava identified, he did not disable any of

those users' accounts:

    Q. Has [Gunter] ever called you and explained to you the
    results of his investigation?

---

[7] Defendants' Hearing Exhibit 4 is a chart that Gunter created that
purports to show every embedded video containing plaintiff's content that Gunter
has removed from myVidster since plaintiff began sending DMCA notices. The chart
includes the date that the DMCA notice for the particular video was received as
well as the date Gunter removed the video. (June Tr. 21-25.) We noted during
the hearing that plaintiff's counsel could not possibly conduct effective cross-
examination regarding the chart because defendants' counsel refused to tender it
to him until the moment it was given to Gunter on the stand. Moreover, we have
doubts about the reliability of the chart. Although Gunter testified that he
created it from a "data dump from myVidster's database," he did not provide any
more detail about how it was prepared or explain how the information he "dumped"
was originally recorded. Moreover, the e-mail exchanges between Flava and Gunter
show that Gunter did not always fully comply with the DMCA notices; even when he
represented that certain content had been removed, it was not always fully
removed, and Flava was forced to follow up with Gunter in an effort to have the
entire content related to a particular file removed. In any event, although it
does appear that it was sometimes like pulling teeth to obtain full compliance
from Gunter, as discussed infra, the crux of the problem here is not so much the
removal of the infringing videos; it is Gunter's attitude toward copyright
protection and his related refusal to adopt measures to prevent or reduce
copyright infringement on myVidster as well as to adopt and implement an
appropriate policy regarding repeat infringers.

- 8 -

A.  Yes, he has.  He's contacted me by email or phone and explained on numerous occasions that he's just a pass-through and that he has no, he has no part into [sic] this copyright infringement, and tries to wiggle his way out and tell us where to go to remove the content.  But we continuously find that the content is still hosted on myVidster.
Q.  Has he ever explained to you why he has not removed repeat infringers?
A.  I don't believe that he has.  This, just beyond the fact that he thinks that he doesn't have to remove the repeat infringers because he doesn't believe that they are repeat infringers, I guess.

(May Tr. 38.)  Bleicher also testified that even after Gunter removed some of Flava's videos from myVidster, those videos resurfaced there because they were re-posted by another user.

According to Bleicher, the availability of Flava's videos on myVidster is causing Flava to lose sales.  Flava's sales are down thirty percent from last year, which equates to a estimated loss of between $100,000 and $200,000, while the number of myVidster users has grown to over 70,000 since the site was created a few years ago.  In addition, myVidster grew from 67,000 visits per month from October 2009 to about 460,000 visits in April 2010.  Bleicher attributes at least some of Flava's lost sales to myVidster because hundreds of Flava's videos have appeared (and still appear) on myVidster.

Gunter testified that he has designed myVidster to filter videos only for adult content (and not to block adult videos, just to classify them).  He is capable of designing myVidster so that it would block the posting of videos with certain associated tag

words, such as plaintiff's trademarks, but claims that he has not implemented such filters because of a "false positives" problem. He explained his position as follows:

> Q. [Y]ou could filter out words like Raw Rods or CocoDorm, correct?
> A. Correct.
> Q. And that would prevent a user from posting any videos with the tag names Flava Works or any other trademark[ed] names on myVidster, correct?
> A. I could design myVidster to block the bookmarking based on tag words, yes.
> Q. Is there any reason why you haven't done that?
> A. The main reason is it's called false positives where if you just try to block a bookmark--when somebody is linking a video from another web site and you have an arbitrary set of key words to block, let's just say CocoDorm, one example that would come to mind to be a false flag is let's just say an actor from CocoDorm was interviewed, and the video was posted on YouTube, and that key word was CocoDorm because that person is an actor of CocoDorm, and that interview video would not be posted, it would be blocked.
>
> So you have an issue of false positives, where okay, if it is material owned by Flava Works, it would block it in that case, but it would also block other videos that would not be owned by the owner.

(May Tr. 103-04.) When asked how difficult it would be to create code or find a script for myVidster filters that would minimize the number of false positives, Gunter stated that he did not know of any code available on the internet for free that would minimize false positives, but acknowledged that he has not searched for code available for purchase or tried to write such a code himself.

When asked by plaintiff's counsel about myVidster's repeat-infringer policy, Gunter testified as follows:

> Q. Let's go to your repeat infringer policy. I asked you one time how many times somebody would have to post

- 10 -

copyrighted materials before you considered them a repeat
infringer, and you would take it on a case-by-case basis,
correct?
A.  Correct.
Q.  And it would probably be two.  If they, if somebody
posted copyright materials at least two times, you would
consider them a repeat infringer?
A.  What is your definition of post?
Q.  Bookmark, post.
A.  When it comes to myVidster's repeat infringer policy,
I cannot, I cannot determine whether or not the user who
links bookmarks of video from a third party web site to
myVidster, I have no idea if they know that them linking
that video or submitting that link to myVidster, if they
have knowledge of the copyright status I guess whether or
not it's infringing or not.  So when it comes to the
subject of them posting links to other web sites to
myVidster, I do not, I would not, I cannot determine
whether or not they are an infringer.  I do not know
what's in their head, I don't know whether or not, if
they see a video and they say, okay, I'm going to save
this, I'm going to link this link to myVidster, whether
or not that link is infringing or not.
Q.  So if a person who has been accused of repeat
infringing reposts a video from a site that's publicly
accessible to members of the public, you wouldn't
consider that person a repeat infringer, that's where
your repeat infringer investigation would end, isn't that
correct?
A.  Correct.  When a user goes to a publicly available--
web site, are they supposed to know whether or not that
is infringing material?  And in my humble opinion, it
would be the video--the person who uploaded and the video
host that is [sic] the ones that are the gatekeepers and
the determination on whether or not that video, that
material is infringement or not.
Q.  So if I--If a user, if a user were to find a full-
length film of Star Trek, which is copyrighted, on
pornhub and which is accessible to everybody of the
members of the public, if that user were to repost it on
[myVidster] and you looked into that, because the video
was originally found on a publicly-accessible [site], you
wouldn't consider that [a] repeat infringer?
A.  Correct.
. . .
A. . . . [M]y repeat infringer policy is I'm looking for
users that are trying to use myVidster as a ways and

- 11 -

means to distribute content that may not be publicly
available.
. . .
Q.  So if somebody alerts you that there's a repeat
infringer and they ask you to investigate and your
investigation does not lead to a password-protected web
site or a single link that is private, your investigation
ends there?
A.  Yes.
Q.  But isn't most of the internet public?
A.  A lot of the internet is public, yes.
Q.  Wouldn't you say like just about more than 90 percent
is public?
A.  Possibly.
Q.  How could you ever have a situation where you would
have a repeat infringer if you just limit it to a
password-protected site?
A.  I came across one that I sent a warning to.
Q.  And I think you've told me that in the time that
you've had myVidster, you've only had one repeat
infringer that you investigated?
A.  Correct.
Q.  And what happened to the other 28 or 27 or 29 [repeat
infringers] that Mr. Bleicher informed you of?
A.  I did not consider them repeat infringers.
Q.  And your reasoning was?
A.  As I stated before, they were not using myVidster as
a ways and means to distribute content that is not
publicly available.  They did not fall under my
definition of repeat infringers, so I did not, I did not
pursue them.
Q.  What about the fact that the videos are copyrighted
and have been on myVidster before?
A.  All links reported on the Flava Works DMCA notices
have been removed expeditiously.
. . .
Q.  Why don't you consider someone a repeat infringer
when they continue to post copyrighted materials on your
web site?
A.  They do not fall under my definition as repeat
infringers.  They may fall under yours or Phillip's, but
they do not fall under mine.
Q.  What is your definition, what is your understanding
of the law in terms of a repeat infringer?
A.  Should I repeat?  Repeat infringers, my policy on
repeat infringers are those who are using myVidster as a
ways and means to distribute content that is not publicly
available.

- 12 -

(May Tr. 111-12, 114-116, 119-20.)

Gunter has not implemented any mechanism on myVidster that would prevent a particular video from being posted on the site more than once, although he conceded that it would not be difficult to do so. (May Tr. 131.) Gunter also has not implemented any mechanism on the myVidster site for users to report videos that violate copyright; the option to "flag" a video for "copyright complaint" merely refers users to the myVidster "copyright" page, which requires a complainant to send a written DMCA notice to Gunter. (May Tr. 120.)

### ***Preliminary Injunction Standards***

The Copyright Act authorizes injunctive relief on such terms as the court deems reasonable "to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). To determine whether a preliminary injunction is warranted, we engage in a two-phase analysis:

> As a threshold matter, a party seeking a preliminary injunction must demonstrate (1) some likelihood of succeeding on the merits, and (2) that it has "no adequate remedy at law" and will suffer "irreparable harm" if preliminary relief is denied. If the moving party cannot establish either of these prerequisites, a court's inquiry is over and the injunction must be denied. If, however, the moving party clears both thresholds, the court must then consider: (3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties.

- 13 -

Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 11-12 (7th Cir. 1992) (citing Lawson Prods., Inc. v. Avnet, Inc., 782 F.2d 1429 (7th Cir. 1986) and Roland Mach. Co. v. Dresser Indus., 749 F.2d 380 (7th Cir. 1984)). "Irreparable injury may normally be presumed from a showing of copyright infringement." Atari, Inc. v. North Am. Philips Consumer Elecs. Corp., 672 F.2d 607, 620 (7th Cir. 1982), superseded by statute on other grounds as recognized in Scandia Down Corp. v. Euroquilt, Inc., 772 F.2d 1423 (7th Cir. 1985). As for the third factor, "courts typically fail to invoke this standard in copyright cases" because if it were applicable, "a knowing infringer would be permitted to construct its business around its infringement." 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 14.06[A][2][c], at 14-138 (2009) (quoting Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1255 (3d Cir. 1983) and citing, inter alia, Horn Abbot Ltd. v. Sarsaparilla Ltd., 601 F. Supp. 360, 369-70 (N.D. Ill. 1984)). Similarly, the fourth factor requires little discussion because there is a strong public policy interest in protecting copyrights. See Erickson v. Trinity Theatre, Inc., 13 F.3d 1061, 1066 (7th Cir. 1994) (quoting Apple Computer, 714 F.2d at 1255 ("It is virtually axiomatic that the public interest can only be served by upholding copyright protections . . . .")). Thus, as a practical matter, the analysis boils down to a single factor--the plaintiff's likelihood

- 14 -

of success.  Flava has demonstrated a likelihood of success on its claim for contributory copyright infringement.[8]

### *Contributory Copyright Infringement*

"[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir. 1971); see also Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005).  To establish contributory copyright infringement, plaintiff must show: (1) a third party directly infringed its work; (2) the defendant knew of the infringement; and (3) the defendant materially contributed to the infringement.  Monotype Imaging, Inc. v. Bitstream Inc., 376 F. Supp. 2d 877, 883 (N.D. Ill. 2005).

Although defendants do not concede the first element, it cannot be seriously disputed that third parties have directly infringed Flava's works by posting its videos on myVidster. Plaintiff has submitted evidence that it owns the copyrights for works that have been copied and distributed by myVidster users, without plaintiff's authorization.  There is uncontradicted evidence that myVidster users have created backup copies of Flava's works, which are stored on myVidster's servers.  There is also

---

[8]/  Because plaintiff has satisfied the standard for a preliminary injunction with regard to its claim for contributory copyright infringement, we need not address its claim for vicarious copyright infringement.

- 15 -

uncontradicted evidence (actually, defendants' own evidence demonstrates) that myVidster users have caused Flava's works to be displayed on myVidster without Flava's permission.

We also have no doubt that defendants knew or should have known of the infringement occurring on myVidster. As noted in our previous opinion, knowledge, for purposes of contributory copyright infringement, encompasses both actual and constructive knowledge. In re Aimster Copyright Litig., 334 F.3d 643, 650 (7th Cir. 2003) ("Willful blindness is knowledge, in copyright law (where indeed it may be enough that the defendant *should* have known of the direct infringement) . . . ."). "The knowledge element for contributory copyright infringement is met in those cases where a party has been notified of specific infringing uses of its technology and fails to act to prevent future such infringing uses, or willfully blinds itself to such infringing uses." Monotype, 376 F. Supp. 2d at 886 (citing Aimster, 334 F.3d at 650, and Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 264 (9th Cir. 1996)). It is undisputed that over a period of several months, plaintiff sent defendants at least seven DMCA notices that identified specific infringing files and users as well as specific repeat infringers. Furthermore, Gunter received these notices and responded to them. Gunter and Bleicher spoke on the telephone and exchanged several e-mails in which Bleicher informed Gunter of ongoing problems with plaintiff's works being posted on myVidster.

- 16 -

The e-mail exchanges (several of which were submitted by *defendants*) show that Gunter, upon receiving Flava's DMCA notices, was not wholly cooperative. In a May 2010 exchange between Gunter and Jesse Lanshe (a representative of the plaintiff) that began with a DMCA notice, Gunter's initial response was to evade responsibility. Instead of addressing whether he would take down the videos appearing on myVidster, Gunter told Lanshe: "I . . . would like to inform you that the videos listed are not hosted by myVidster. What you are seeing are video embeds. . . . I would recommend you contact the video host that is rehosting your content. When they remove the content from their servers the video embeds will no longer work. If i [sic] removed the embeds from user's [sic] collection they can easily revised [sic] the source site and embed the video again."[9] Only later in the e-mail exchange did Gunter inform Lanshe that he did "not have an issue removing the video embeds/links." (Defs.' Hr'g Ex. 10.) Bleicher also testified, and some of the e-mail exchanges show, that when notified of infringing material, Gunter sometimes removed only part of the infringing material. He removed the remaining material (for example, infringing thumbnail images, or various stray files) only when prompted a second or third time to remove it.

Moreover, Gunter has failed to implement filters or identifiers to prevent repeated infringing conduct and failed to

---

[9] This statement also demonstrates Gunter's failure to act to prevent future infringement on myVidster.

- 17 -

take action against, or properly investigate and/or disable the accounts of, myVidster users whom plaintiff identified as repeat infringers. Gunter's "repeat infringer" policy is in fact no policy at all, at least with respect to copyright infringement. In an e-mail to Bleicher on October 19, 2010 that is part of an exchange concerning repeat infringement, Gunter stated:

> Here is the policy that I use when addressing [repeat infringers]:
> A user who uses myVidster to publish links/embeds of videos that would otherwise not be accessible by the public. For example if a user is uploading videos to file server and using myVidster as a way and means to distribute the content.
> If a user is found in violation of this, the links/embeds will be removed and a warning email is sent to the user. If the user repeats this violation then their account will be deleted.
> Being that most of the content are embeds which are hosted on external websites, I would suggest contacting the websites that are hosting your content to help stop the future bookmarking of it on myVidster.

(Defs.' Hr'g Ex. 9.) This perspective is the epitome of "willful blindness." Gunter is not concerned about *copyright* infringement; he simply examines whether the material posted by the user is "otherwise not [] accessible by the public," i.e., behind a paywall or otherwise private website. In the e-mail, he again pointed a finger at other websites while failing to acknowledge that his own website is perpetuating copyright infringement. When Gunter testified in the preliminary injunction hearing, his cavalier attitude had not changed. His definition of "repeat infringer" does not encompass copyright law. There is ample evidence that

- 18 -

after having received the DMCA notices from plaintiff, defendants failed to act to prevent future similar infringing conduct.

There is also evidence that defendants materially contributed to the infringing activity of myVidster's users.  Gunter provides the myVidster site, which enables the display of embedded videos and thus the infringement.  Gunter also makes video storage (which involves making a copy of a video) available for a fee.  When Gunter first introduced the "video backup" service in 2009, he provided it free of charge for a limited time, and he discussed it on his myVidster blog and listed reasons for using the service. One of the reasons, he stated, is "[n]ever fearing that your online videos will get removed by the video host."  (Pl.'s Hr'g Ex. 6.)[10] Videos are often removed by hosts because the copyright owner asserts a copyright claim and requests takedown.  The backup function enables users to keep an infringing copy of a video that

---

[10]/ Gunter attempted to explain away this subtle encouragement of copyright infringement by stating that it is "two years old" and that myVidster has "evolved." (May Tr. 124-25.) The promotional commentary, however, still appears on his myVidster blog as a reason for using the backup service.

Another way in which Gunter subtly encourages copyright infringement relates to the videos that he marked as his "favorites" on myVidster. Plaintiff's Hearing Exhibit 8 is a screenshot of three videos that Gunter has labeled on myVidster as "Marques' Favorites >> Full Movies." The three videos are labeled "Star Trek," "Crank 2," and "Hancock," which are all titles of major motion pictures. Gunter was asked about the embedded "Star Trek" video at the preliminary injunction hearing. He admitted that he had not considered whether he had been given permission by the copyright owner to post that video on myVidster. (May Tr. 107-09.) Gunter also conceded at the hearing that he could "make an assumption that" a "feature, full-length film" would be copyrighted, but acknowledged that at his deposition, he had refused to admit that he was able to make such an assumption and had instead suggested that only a copyright owner could assess whether a film was copyrighted. (May Tr. 105-06.) When asked by his own counsel on June 9, however, whether he "could tell" at the time he posted the videos "whether or not the videos . . . were infringing someone else's copyrights," Gunter replied, "I would not have an idea." (June Tr. 17.)

- 19 -

has become otherwise unavailable on the original host site due to a copyright claim. In addition, the "download" button, where available on myVidster, enables a user to download from the source site a copy of an embedded video.

MyVidster also explicitly encourages sharing but fails to include any warnings about copyright infringement. Under the myVidster tab marked "invite," the question "Why should I invite my friends?" appears with the following answer: "While bookmarking videos can be a fun and addictive activity, it is more enjoyable in the company of like minded friends. The form below will send invites to your friends telling them about myVidster and you will be given the option to provide a link to your video collection." (Third Am. Compl. Ex. E.) MyVidster does not warn its users to avoid posting videos that infringe copyright. In fact, its very brief terms of service page does not mention copyright at all. Rather, the terms reflect Gunter's indifference to copyright protection:

> Do not bookmark any video content that contains child pornography, promotes racism/hate or in violation of US law. Do not bookmarking [sic] videos that are not accessible by the public. For example videos hosted on password protect [sic] websites or private file servers. Failing to do so will result in the deletion of your account without notice. All adult related video content must be flagged as either "adult" or "private".

(Pl.'s Hr'g Ex. 16.)

There is still more evidence that Gunter materially contributed to users' infringement. Gunter acknowledged that he

did not consider or investigate whether the users identified by plaintiff as repeat infringers were infringing copyright; he merely investigated whether the users were posting videos containing "content that is not publicly available." (May Tr. 114-15.) He has not implemented any filters or identifiers to prevent repeat infringers.[11] He has not implemented any mechanism to prevent the same infringing video from being re-posted to myVidster, even though he acknowledged that implementation would not be difficult. (May Tr. 130-31.) Furthermore, Gunter took virtually no action to stop or ban the repeat infringers who posted plaintiff's copyrighted works on myVidster (except for warning one of those users to stop posting videos hosted on password-protected web sites, Defs.' Hr'g Ex. 6).[12]

### *"Safe Harbor" Defense*

Defendants contend that they qualify for one of the four "safe harbors" from liability set forth in the DMCA. Section 512, also known as the Online Copyright Infringement Liability Limitation Act (OCILLA), creates limitations on liability for network service providers who meet all of the conditions for a particular safe-

---

[11]/  When the court asked Gunter about the likelihood of false positives with respect to keywords connected with plaintiff's content, Gunter conceded that "false positives" would not occur very often. (May Tr. 132-33.)

[12]/  Contrary to defendants' argument, there is evidence in the record-- namely, screenshots of videos posted to myVidster that identify the user who posted the video--that at least some of the users identified by plaintiff as repeat infringers, such as "fifthcharactermuppet" and "Damon1420," did in fact post videos containing plaintiff's copyrighted content on two or more occasions.

harbor exemption.  Defendants assert that they qualify for the safe
harbor for information "residing on systems or networks at [the]
direction of users," 17 U.S.C. § 512(c).

We need not discuss each of the requirements of § 512(c)
because it is clear that defendants do not satisfy one of the
threshold requirements.  Section 512 provides in pertinent part:

> The limitations on liability established by this section
> shall apply to a service provider only if the service
> provider--
> has adopted and reasonably implemented, and informs
> subscribers and account holders of the service provider's
> system or network of, a policy that provides for the
> termination in appropriate circumstances of subscribers
> and account holders of the service provider's system or
> network who are repeat infringers . . . .

17 U.S.C. § 512(i)(1)(A).

It is difficult for us to understand how defendants can argue
with a straight face that they have adopted and reasonably
implemented a "repeat infringer" policy.  Gunter determines the
policies for, and controls, myVidster.  His understanding of the
term "infringer" does not encompass the law of copyright; he
operates his site under the mistaken view that an "infringer" is
limited to a person who posts content that is hosted on a password-
protected or private website.  The statute does not define the term
"repeat infringer," but it is an obvious conclusion that
"infringer" refers at the very least to someone who *infringes
copyright*.  See 3 Nimmer, supra, § 12B.10[B][1], at 12B-103 (2009)
("[I]n the context of the placement of Section 512 into the

Copyright Act, an 'infringer' most naturally refers to someone who infringes another's copyright."). Gunter does not warn his users about copyright infringement (coyly instructing them not to violate "US law" does not cut it). He removes videos from myVidster that are listed in DMCA notices, but goes no further. Beyond his mechanical response to the notices, Gunter refuses to concern himself with copyright protection. It is true that service providers are not required to police their sites for infringement, but they are required to investigate and respond to notices of infringement--with respect to content and repeat infringers. See Aimster, 334 F.3d at 655 ("The [DMCA] does not abolish contributory infringement. The common element of its safe harbors is that the service provider must do what it can reasonably be asked to do to prevent the use of its service by 'repeat infringers.'"). Gunter's attitude is similar to that of Aimster, which the Seventh Circuit deemed an "ostrich-like refusal to discover the extent to which its system was being used to infringe copyright," noting that it was "another piece of evidence" of contributory infringement. Id. It would be very easy for Gunter to determine whether a particular myVidster user had posted, on two or more occasions, a video that infringes one of plaintiff's copyrights. He refuses to do so, and he refuses to acknowledge his duty to terminate the accounts of such users.

- 23 -

Defendants are not eligible for the user-generated-content safe harbor. Plaintiff has shown that it is likely to succeed on its claim for contributory copyright infringement. Defendants have failed to rebut the presumption of irreparable harm that arises from a showing of copyright infringement. Their assertion that plaintiff waited too long to bring suit and to bring its motion is rejected. Before filing suit, plaintiff made several attempts to seek Gunter's full compliance with the numerous DMCA notices that it sent. That compliance never came; plaintiff should not be penalized for initially trying to avoid litigation. We also reject defendants' contention that the existence on other websites of material that infringes plaintiff's copyright somehow suggests that plaintiff is not suffering irreparable harm from defendants' activities.

This is a proper case for issuance of a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 and the Copyright Act because (1) plaintiff is likely to succeed on the merits of its contributory infringement claim; (2) unless a preliminary injunction issues, plaintiff will suffer irreparable harm to its business; (3) the balance of harms favors plaintiff; and (4) the public interest favors granting a preliminary injunction.

### ***Appropriate Relief***

Plaintiff has submitted a proposed injunctive order. Our views on the proposed provisions are as follows:

- 24 -

¶ 1:    This paragraph is unnecessary.  An order that defendants "comply with U.S. copyright law" is not appropriately tailored relief.  Moreover, the second sentence is unnecessary because it should be understood from this opinion that, in plaintiff's words, the "fact that a video is available publicly on the [i]nternet shall not be reason for [Gunter's] abdication of [his] responsibility to make a determination as to whether or not a video is copyrighted."

¶ 2:    Plaintiff presented no evidence on what constitutes "digital fingerprinting" or whether its implementation would be reasonably feasible or affordable.  We decline to order that defendants implement this technology.

¶ 3:    This relief is appropriate.

¶ 4:    Should be modified to read: "Filter the following keywords and tags to prevent the upload or download of, posting of links to videos, and the posting of embedded videos containing plaintiff's copyrighted content, including intentional or inadvertent misspellings of keywords and tags . . . "

¶ 5:    Should be modified to read: "Adopt and reasonably implement a repeat-infringer policy with respect to the infringement of copyright."

¶ 6:    We will not require defendants to implement "flag" buttons that work in the particular way described by plaintiff.

- 25 -

However, we will more generally require defendants to implement measures designed to prevent repeat infringement.

¶ 7: This relief is appropriate.

¶ 8: More broadly, we will require defendants to disable the accounts of users who on two or more occasions have posted content that infringes on one or more of plaintiff's copyrights.

¶ 9: This relief is appropriate.

¶ 10: Plaintiff has included a paragraph ordering defendants to pay its attorney's fees and costs associated with the bringing of the motion. Plaintiff did not include a request for this relief in its motion or memorandum, nor did it develop this argument. Therefore, this provision will not be included in the order.

¶ 11: Ordering the shutdown of myVidster.com would not be appropriately tailored relief. This paragraph should be stricken.

We believe that the order should also direct defendants to file with the court and serve plaintiff with a report or series of reports of compliance that identify all steps defendants have taken to comply with the injunction order. The parties should confer in an attempt to agree on a schedule for the provision of the report or reports.

The injunction order should also include a provision stating that it shall become effective upon the plaintiff's posting of a $20,000 bond.

- 26 -

## CONCLUSION

For the foregoing reasons, plaintiff's motion for a preliminary injunction [20] is granted. Plaintiff is directed to prepare a proposed preliminary injunction order in accordance with this opinion and submit it to defendants by August 5, 2011. Thereafter, the parties shall confer and attempt to agree on the language of the proposed injunction order. Plaintiff shall submit the final proposed injunction order to the court by August 15, 2011; if there are any outstanding disputes with respect to its language, the plaintiff shall submit, along with the proposed order, a brief statement describing the disputes.


DATE:        July 27, 2011


ENTER:       _____
             John F. Grady, United States District Judge