IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Flava Works, Inc., | ) |
|         Plaintiff, | ) |
| v. | ) Honorable John F. Grady |
| Marques Rondale Gunter d/b/a myVidster.com, SalsaIndy, LLC, John Does 1-26, Voxel Dot Net, Inc., | ) Case No. 1:10-cv-06517 |
|         Defendants. | ) |

**DEFENDANTS' BRIEF IN SUPPORT OF**
**MOTION TO RECONSIDER PRELIMINARY INJUNCTION**

**Introduction**

Defendants respectfully request that the Court reconsider its preliminary injunction decision for two reasons:

*First,* myVidster has voluntarily suspended its video backup functionality and, thus, that portion of the site is no longer pertinent to the preliminary injunction analysis.

*Second,* the remainder of the Court's decision is founded on the proposition that myVidster users who link to third-party hosted videos can be direct infringers. This is directly contrary to the Ninth Circuit's seminal decision in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1160-61 (9th Cir. 2007), which held that linking to third-party materials cannot constitute direct infringement as a matter of law. Once it is understood that myVidster user's can – at most – be contributory infringers, the analysis of this case changes fundamentally. To even get started in making a contributory infringement case against myVidster, Plaintiff must first establish that myVidster user's had knowledge that the third-party videos they were linking to were infringing. Plaintiff has made no showing whatsoever in that regard.

**I.      Backup Services Have Been Suspended And Thus Need Not Be Further Enjoined.**

myVidster has suspended – pending the resolution of this case – the backup services it previously offered to its premium users. This means that between now and the resolution of this matter, no additional videos will be backed up onto myVidster servers. This step will maintain the status quo with respect to the backup functionality, and eliminate any argument that further injunctive relief is necessary as to that aspect of the site. Accordingly, the preliminary injunction analysis can now focus solely on myVidster's primary functionality – the bookmarking of videos that reside on third-party servers.[1]

**II.     With Respect To Bookmarking, *Perfect 10* Demonstrates That Plaintiff Has No Likelihood Of Success.**

   **A.     *Perfect 10* Establishes That Linking To Third-Party Materials Cannot Constitute Direct Infringement As A Matter Of Law.**

With respect to its analysis of myVidster's bookmarking functionality, the Court appears to base its analysis on the notion that by linking to infringing source videos, myVidster's users are direct infringers. Indeed, the Court begins its infringement analysis by stating that "*it cannot be seriously disputed that third parties have directly infringed Flava's works by posting its videos on myVidster*," and proceeds to make clear that it believes these so-called "direct[] infringe[rs]" include myVidster users that link to infringing videos hosted by third parties. *See* Mem. Op. at 14. This proposition, however – from which all of the Court's analysis flows – is directly contrary to the prevailing legal standard as established by the Ninth Circuit in *Perfect 10*. *See e.g.,* 3-12B Nimmer on Copyright § 12B.01 (recognizing Perfect 10 as the prevailing standard for analyzing copyright infringement in the online linking context). According to the

---

[1] To the extent Plaintiff's Motion for Preliminary Injunction rests on myVidster's creation and hosting of thumbnail images of Plaintiff's videos, the *Perfect 10* decision also held that a website operator's creation and hosting of thumbnail images is protected by the doctrine of fair use. *Perfect 10,* 508 F.3d at 1168.

*Perfect 10* decision, a party that links to third-party materials cannot be a direct infringer, but at most can be a contributory infringer.

In *Perfect 10*, the plaintiff pornography company sued Google for copyright infringement based on the fact that Google created and hosted "in-line links" to unauthorized copies of plaintiff's copyrighted images. *Perfect 10,* 508 F.3d at 1154. Acknowledging that the case presented novel questions, the Ninth Circuit began by performing a detailed examination of the linking technology. The court recognized that while the images were hosted on third-party websites, the user viewed the videos as if they were on the Google website:

> When a user clicks on the thumbnail image returned by Google's search engine, *the user's browser accesses the third-party website and in-line links to the full-sized infringing image stored on the website publisher's computer*. *This image appears*, in its original context, on the lower portion of the window on the user's computer screen *framed by information from Google's webpage*.

*Id.* at 1157. The court concluded that while Google provided "instructions" directing the user's browser to obtain the images from the host computer and ultimately "fram[ed]" the images within information provided by Google, Google did not "store the images" or "communicate the images to the user":

> … HTML instructions direct the user's browser to cause a rectangular area (a "window") to appear on the user's computer screen. The window has two separate areas of information. The browser fills the top section of the screen with information from the Google webpage, including the thumbnail image and text. *The HTML instructions also give the user's browser the address of the website publisher's computer that stores the full-size version of the thumbnail*. By following the HTML instructions to access the third-party webpage, *the user's browser connects to the website publisher's computer, downloads the full-size image*, and makes the image appear at the bottom of the window on the user's screen. *Google does not store the images that fill this lower part of the window and does not communicate the images to the user; Google simply provides HTML instructions directing a user's browser to access a third-party website*. However, the top part of the window (containing the information from the Google webpage) appears to frame and comment on the bottom part of the window. *Thus, the user's window appears to be filled with a single integrated*

3

> *presentation of the full-size image, but it is actually an image from a third-party website framed by information from Google's website.*

*Id.* at 1155-56.

Having carefully examined the technology, the Ninth Circuit affirmed the district court's denial of a preliminary injunction on the grounds that plaintiff was unlikely to succeed in establishing that linking to third-party materials in this way could constitute direct copyright infringement. *Id.* at 1159. Specifically, the court held that the linking functionality never caused Google to store a copy of the infringing material for purposes of the Copyright Act:

> Google does not, however, display a copy of full-size infringing photographic images for purposes of the Copyright Act when Google frames in-line linked images that appear on a user's computer screen. ***Because Google's computers do not store the photo-graphic images, Google does not have a copy of the images for purposes of the Copyright Act.*** In other words, Google does not have any "material objects ... in which a work is fixed ... and from which the work can be perceived, reproduced, or otherwise communicated" and thus cannot communicate a copy. 17 U.S.C. § 101.

*Id.* at 1160-61. The court further held that providing HTML instructions to a user's computer to obtain a copy is not equivalent to displaying a copy for purposes of the Copyright Act:

> Instead of communicating a copy of the image, Google provides HTML instructions that direct a user's browser to a website publisher's computer that stores the full-size photographic image. ***Providing these HTML instructions is not equivalent to showing a copy.*** First, the HTML instructions are lines of text, not a photographic image. Second, HTML instructions do not themselves cause infringing images to appear on the user's computer screen. ***The HTML merely gives the address of the image to the user's browser. The browser then interacts with the computer that stores the infringing image. It is this interaction that causes an infringing image to appear on the user's computer screen.***

4

*Id.* at 1161. Based on these findings, the court held that Google's acts of creating and hosting in-line links to third-party materials could not constitute direct infringement as a matter of law. *See Id.* It could, at most, "raise[] only contributory liability issues." *See Id.*

### B. Bookmarking By myVidster Users Is The Same As In-Line Linking By Google.

The present case requires application of copyright law to essentially the same technology that the Ninth Circuit addressed in *Perfect 10*. According to *Perfect 10*, the critical factual inquiry is the location of the infringing image. *See Perfect 10,* 508 F.3d at 1159. The district court in *Perfect 10* called this the "server test," and held that where an image is stored at, and served from, a third-party server, merely linking to that image cannot constitute direct infringement. *See Id.* Just as in *Perfect 10,* this Court correctly acknowledged that the pornographic videos in this case are "hosted on third-party websites."[2]

In addition to the fact that the myVidster videos are hosted on third-party servers, the way the videos are linked and displayed is the same as in *Perfect 10*. What myVidster calls "bookmarks" are merely links of the type addressed in *Perfect 10*. *See* June Tr. at 8:17 – 9:4 (*"[A] bookmark is a link. A link is a pointer to a webpage or a file … on a website."*). They are HTML instructions that direct a viewer's browser to access a particular file at a particular location. June Tr. at 8:17 – 9:4 and 16:4 – 17:1. In the case of myVidster, they direct the viewer's browser to obtain a video from a third-party server. *See* June Tr. at 8:17 – 9:4 and 16:4 – 17:1 (*"…so basically those bookmarks are links, in myVidster's case, pointing to other websites around the web."*). These links are sometimes referred to as "embeds" because the video will be shown to the viewer as if it is part of the myVidster site, even though the video is

---

[2] The exception to this statement is the small number of backup copies of Plaintiff's videos that are hosted on myVidster's servers. However, as noted above, myVidster's backup functionality has been suspended pending the resolution of this case and thus has no impact on the preliminary injunction analysis or this Motion.

5

hosted and displayed by the third-party server. *See* June Tr. at 16:4 – 17:1 (***"Embed is the link to the video. Basically it's a way for you to display a video that is not hosted on your website. … It is … a link to a video from another website that is playable."***). This is the same thing that the *Perfect 10* court described as "framing." *See Perfect 10*, 508 F.3d at 1157.

The only material difference between the two systems is that whereas Google both creates and hosts links, myVidster only hosts links, leaving the creation of the links to its users. However, the Ninth Circuit addressed both of these steps in *Perfect 10*, making clear that neither the creation nor the hosting of links to infringing content can be an act of direct copyright infringement. *Perfect 10*, 508 F.3d at 1161. Therefore, myVidster cannot be a direct infringer and – more importantly for purposes of this case – myVidster's users cannot be direct infringers, as a matter of law. myVidster's users can, at most, be liable for contributory infringement.

    **C.**    **Plaintiff Has Presented No Evidence That myVidster Users Had The Requisite Knowledge To Be Liable For Contributory Infringement.**

Once it established that myVidster's users who link to third-party videos can – at most – be contributory infringers, the entire analysis of this case must change. It cannot simply be ***assumed*** that myVidster's users are infringers because the videos to which they are linking are unauthorized. Rather, it must be ***determined*** whether these users meet the legally recognized requirements for contributory infringement. And if the users are not contributory infringers, myVidster cannot be a contributory infringer for having assisted those users.

This Court correctly acknowledged that a claim of contributory infringement includes a "knowledge" requirement. *See* Mem. Op. at 14 ("To establish contributory copyright infringement, plaintiff must show: (1) a third party directly infringed its work; (2) the defendant knew of the infringement; and (3) the defendant materially contributed to the infringement.").

Thus, a myVidster user can only commit contributory copyright infringement if he *knew* that the specific source video he was linking to was infringing.

Plaintiff has offered no evidence whatsoever that any myVidster user knew that a specific source video he was linking to was infringing. There is no evidence that Plaintiff ever put a myVidster user on notice that a given source video was infringing. And there is no evidence that any myVidster user continued to link to a given source video after having been put on notice that it was infringing. Rather than making such a showing, Plaintiff asks this Court to simply assume that all myVidster users have the requisite knowledge each time they link to an infringing source video. But, it is axiomatic that an element of a claim, such as knowledge of infringement, cannot simply be assumed. It must be proven.

Not only can knowledge of infringement not be assumed as a legal matter, it cannot be assumed as a practical matter. People who surf the Internet watching and linking to videos typically do not even know where or by whom the videos are hosted, much less whether or not a given copy is authorized by the copyright owner. Indeed, the Internet is rife with copies of movies, television shows, and other video files many of which are authorized, many of which are not. It is nearly impossible for the average Internet user to know the difference because they are not privy to the agreements and relationships between the host and the copyright holder. Plaintiff's works are no different. Plaintiff has conceded that there are both authorized and unauthorized versions of Plaintiff's copyrighted videos widely available on the Internet. *See* May Tr. at 82:20 – 83:5. Thus, it cannot merely be assumed that a given myVidster user knows that a specific source video he links to is unauthorized.

Having failed to make a showing that myVidster users had the requisite knowledge to be deemed contributory infringers, Plaintiff has, by definition, failed to establish contributory

7

infringement on the part of myVidster, which is one step further removed from any possible direct infringement. The knowledge requirement, of course, applies to myVidster as well. Thus, in the context of a claim that myVidster is contributing to the contributory infringement by its users, Plaintiff must establish myVidster *knew* that a given user *knew* that a specific source video the user was linking to was infringing. Plaintiff has not even attempted to make such a showing.[3]

To be sure, Plaintiff put on evidence that on numerous occasions it sent myVidster DMCA notices.[4] But what is the significance of those DMCA notices in terms of myVidster's knowledge of contributory infringement by its users who are merely linking to third-party materials? None. Plaintiff's DMCA notices arguably put myVidster on notice that the third-party hosting a given source video is not authorized to do so. The notices, however, say nothing about the myVidster user who linked to the third-party video having been given notice, or otherwise having knowledge, that the third-party source video is infringing. Thus, Plaintiff's

---

[3] The Court's reliance on the concept of "willful blindness" as articulated in *In re Aimster Copyright Lit.* to impute constructive knowledge to myVidster is misplaced for two reasons. First, as outlined above, there was no evidence that any given myVidster user had the requisite knowledge to be a contributory infringer. Thus, Plaintiff identified nothing actionable on the part of myVidster users with respect to which myVidster could be "willfully blind." Second, the facts in *Aimster* that led to the court's finding of "willful blindness" are wholly inapplicable to the present case. *Aimster* was a downloading case – not a linking case – and thus Aimster users could be analyzed as direct infringers rather than contributory infringers. *In re Aimster*, 334 F.3d 643 (7th Cir 2003). Moreover, in *Aimster*, the Court found that the defendant was willfully blind because it had intentionally created and provided encryption software to users to ensure that it could not see the identities of its users or what songs the users copied. *Id*. at 650-51 ("a service provider that would otherwise be a contributory infringer does not obtain immunity by using encryption to shield itself from actual knowledge of the unlawful purposes for which the service is being used). myVidster has taken no such steps, and, in fact, has designed its system so that it can readily find and take appropriate action regarding specific content and users pursuant to DMCA notices it receives. *See e.g.,* Defs. Exs. 4 and 5.

[4] myVidster has presented uncontroverted evidence that each time it received a DMCA notice from Plaintiff, it expeditiously removed all videos and links contained within each notice. *See* June Tr. at 21:16-18 and 25:8-11 and Defs. Exs. 4 and 5.

DMCA notices do nothing to put myVidster on notice that a particular user has committed an act of contributory infringement with respect to linking to a particular source video.

Plaintiff utterly failed to make any showing that any myVidster user had the requisite knowledge to commit an act of contributory infringement and, correspondingly, that myVidster had the requisite knowledge to be deemed to have contributed to that contributory infringement. Accordingly, Plaintiff has no likelihood of success on the merits of its contributory infringement claim against myVidster and its motion for preliminary injunction should have been denied on that ground alone.

D.   **In Light Of *Perfect 10*, myVidster's Repeat Infringer Policy Is More Than Reasonable And myVidster Is Entitled To Safe Harbor Protection.**

The above analysis demonstrates not only that Plaintiff has no likelihood of success on the merits of its contributory infringement claim against myVidster, but also that myVidster is protected by certain safe harbors afforded by Section 512 of the DMCA. The Court denied myVidster safe harbor protection for failing to adopt and reasonably implement a repeat infringer policy. Mem. Op. at 21. However, when viewed in light of the legal standard provided by *Perfect 10*, it becomes clear that myVidster's repeat infringer policy is more than reasonable.

It is axiomatic that in the context of the DMCA, "repeat infringer" refers to someone who has been legally proven an infringer. 3-12B Nimmer on Copyright § 12B.10[B][3][b] ("When Congress wished to refer to individuals who were proven infringers, it knew how to do so. It routinely prefaced references to others as "alleged infringers" or "claimed infringers." In the current context, by contrast, Congress used the term "repeat infringers" without any such qualification. ***The meaning unmistakably denoted is those against whom infringement has been established, not against whom it is merely alleged***.") As set forth above, a myVidster user can only be an infringer if it knows that a specific source video it is linking to is infringing.

Plaintiff has offered no evidence that any myVidster user has had the requisite knowledge with respect to any specific video, much less that they have done so a sufficient number of times to be deemed a repeat infringer. As discussed above, there is no evidence that Plaintiff ever put a myVidster user on notice that a given source video is infringing, and the DMCA notices sent by Plaintiff to myVidster do nothing to establish the requisite knowledge of infringement on the part of the myVidster user. Having identified no myVidster users who are infringers, much less repeat infringers, it cannot be the case that Plaintiff has demonstrated that myVidster has failed to reasonably implement a repeat infringer policy. *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007) ("***Because it does not have an affirmative duty to police its users, failure to properly implement an infringement policy requires a showing of instances where a service provider fails to terminate a user even though it has sufficient evidence to create actual knowledge of that user's blatant, repeat infringement of a willful and commercial nature***.").

When viewed in light of *Perfect 10*, myVidster's repeat infringer policy is not only reasonable, but in fact goes beyond what is required by the DMCA to achieve safe harbor protection. The DMCA puts the burden of policing copyright infringement and providing notice of copyright infringement on the copyright owner. *See Wolk v. Kodak Imaging Network*, 2011 WL 940056, *5 (S.D.N.Y. March 17, 2011); *UMG Recordings, Inc. v. Veoh Networks, Inc.* (665 F. Supp. 2d 1099, 1110 (C.D. Cal. 2009); *CCBill*, 488 F.3d at 1113 (the court "***decline[d] to shift [the] substantial burden [of policing for infringement] from the copyright owner to the provider***.").

Thus, contrary to the Court's assertion that myVidster is "required to investigate … notices of infringement—with respect to content *and* repeat infringers" (Mem. Op. at 22), myVidster need only appropriately respond to DMCA notices it receives. H.R. Rep. 105-551(II),

at 61 ("[T]he Committee does not intend this provision to undermine the principles of new subsection (1) or the knowledge standard of new subsection (c) by suggesting that a provider must *investigate possible infringements, monitor its service, or make difficult judgments as to whether conduct is or is not infringing*." (emphasis added)); *see also Viacom v. Youtube*, 718 F. Supp. 2d 514, 524 (S.D.N.Y. 2010) ("*The DMCA is explicit: it shall not be construed to condition 'safe harbor' protection on a service provider monitoring its service or affirmatively seeking facts indicating infringing activity* ....") (internal quotations and citations omitted).

In the event that myVidster gains knowledge (through DMCA notices or otherwise), that one of its user is linking to source videos despite having knowledge (through DMCA notices or otherwise) that the source video is infringing, myVidster would treat that user as an infringer. If such infringement continues repeatedly, myVidster would disable that user's myVidster account pursuant to its repeat infringer policy. *See* Defs. Ex. 3 at 2. As discussed, there is no evidence that myVidster has ever obtained knowledge of such a circumstance and thus, by definition, Plaintiff has failed to identify any breakdown in myVidster's repeat infringer policy.

The Court focused its analysis on myVidster's efforts to investigate, after receiving a DMCA notice, whether the source video was publicly available or private and password-protected. These efforts should be viewed in light of the fact that, as discussed above, myVidster has no duty to "investigate possible infringement, monitor its services, or make difficult judgments as to whether conduct is or is not infringing." H.R. Rep. 105-551(II), at 61. In fact, given that there has been no evidence presented that any particular myVidster user had the requisite knowledge to be a contributory infringer, myVidster's public/private source investigation can only be seen as going above and beyond what is required for a reasonable repeat infringer policy under the DMCA.

With this backdrop, the undisputed testimony established that after receiving a DMCA notice with respect to a given video, myVidster investigates the source video to determine whether it is publicly available or private. June Tr. at 30:6 – 31:18. If the video is publicly available, myVidster does not know whether the user who linked to it knew the video to be an unauthorized copy. June Tr. at 30:6 – 31:18. Conversely, if the source video is private and password-protected, myVidster treats this fact as an objective indication that the user linking to the source video has knowledge that is infringing. June Tr. at 30:6 – 31:18. Based on this objective indication, myVidster treats the user who links to the private, password-protected source video as if he were a contributory infringer for purposes of its repeat infringer policy. June Tr. at 30:6 – 31:18. Accordingly, through this investigation, myVidster has gone much further than is required by the DMCA in attempting to investigate and identify potentially infringing users.

Once the reasonableness of myVidster's repeat infringer policy is acknowledged, the Court should readily conclude that myVidster's linking functionality is protected by the safe harbor contained in 17 U.S.C. § 512(d). As shown above, myVidster's linking functionality is nearly identical to Google's functionality at issue in *Perfect 10*. Indeed, when myVidster and its users are viewed together, they engage in the exact same posting and hosting of links that Google did. Just over a year ago, the Central District of California held that Google's linking functionality was eligible for the Section 512(d) safe harbor and granted partial summary judgment in favor or Google on plaintiff's claims based on the linking functionality. *Perfect 10, Inc. v. Google, Inc.*, 2010 U.S. Dist. LEXIS 75071, at *16-36 (C.D. Cal. Jul. 26, 2010). Accordingly, myVidster's linking functionality is also subject to the protections of 17 U.S.C. § 512(d).

Given that myVidster is entitled to the safe harbor protection afforded by Section 512, Plaintiff has no likelihood of success on the merits of its case for this additional reason. Plaintiff's motion for preliminary injunction should be denied for this reason as well.

## CONCLUSION

In light of the prevailing legal standard articulated in *Perfect 10*, Plaintiff has failed to demonstrate a likelihood of success either in establishing a contributory infringement on the part of myVidster or in avoiding the safe harbor protection afforded to myVidster by Section 512 of the DMCA. Accordingly, Plaintiff's Motion for Preliminary Injunction should have been denied.

Respectfully submitted,

Date:  August 15, 2011 /s/Gregory J. Leighton
One of the Attorneys for Defendants,
Marques Rondale Gunter and SalsaIndy, LLC

Kevin C. May
William J. Lenz
Gregory J. Leighton
Kathleen E. Blouin
Neal, Gerber & Eisenberg LLP
2 North LaSalle Street, Suite 1700
Chicago, Illinois  60602
312.269.8000

**CERTIFICATE OF SERVICE**

I, Gregory J. Leighton, an attorney, state that I caused a copy of the foregoing, DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO RECONSIDER PRELIMINARY INJUNCTION, to be served upon the following counsel of record via the Court's ECF system on August 15, 2011:

>Meanith Huon
>Huon Law Office
>P.O. Box 441
>Chicago, Illinois 60690

>  /s/Gregory Leighton
>Gregory J. Leighton