IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Flava Works, Inc., | ) |
|         Plaintiff, | ) ) ) |
|         v. | ) Honorable John F. Grady ) |
| Marques Rondale Gunter d/b/a myVidster.com, SalsaIndy, LLC, John Does 1-26, Voxel Dot Net, Inc., | ) Case No. 1:10-cv-06517 ) ) ) ) |
|         Defendants. | ) ) |

**DEFENDANTS' BRIEF IN SUPPORT OF**
**MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL**

On September 1, 2011, this Court issued an order for Preliminary Injunction ("the Order") which, upon compliance, will essentially destroy the business of myVidster.com ("myVidster"). The Order requires myVidster to design, implement and maintain a litany of policies and procedures including, *inter alia*, creating a filtering system that would prevent users from posting content to myVidster containing a list of terms related to Plaintiff, replacing myVidster's infringement policy with a new repeat one whereby any user who posted a link to content that turned out to be infringing more than once would be terminated, and removing non-copyrighted material related to any content removed pursuant to a DMCA notice. These draconian measures will substantially degrade the functionality of myVidster and drive its users to competitor websites causing an irreparable loss in market share which will ultimately doom myVidster's business and existence. The scope of the injunction is simply overreaching and its requirements are not commensurate with protection of Plaintiff's rights. Indeed, after an initial review, it appears myVidster will be forced to immediately disable the accounts of approximately **8300 myVidster users** (which represents nearly 8% of its user-base) in the

absence of stay. Accordingly, myVidster intends to appeal the Order immediately and respectfully requests that this Court issue a temporary stay of the Order in order to allow the Seventh Circuit to rule on the Order's merits. A stay should issue because myVidster's appeal presents substantial issues of law, and denying the stay will effectively destroy myVidster. If the Court is unwilling to issue a stay of its Order pending the entire appeal on the merits of its Order then, at a minimum, myVidster respectfully requests that the Court issue a stay of its Order at least until the Seventh Circuit has had an opportunity to rule on an emergency motion regarding whether the Order should be stayed pending appeal.

I. **THE EQUITIES WEIGH HEAVILY IN FAVOR OF GRANTING A STAY PENDING APPEAL.**

This Court may grant a stay "[w]hile an appeal is pending from an interlocutory order or final judgment that grants, dissolves, or denies an injunction…." Fed. R. Civ. P. 62(c). There are four factors to consider when determining whether to grant a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S. Ct. 2113 (1987); *Hinrichs v. Bosma,* 440 F.3d 393, 396 (7th Cir. 2006) *rev'd on other grounds* at *Hinrichs v. Speaker of the House of Representatives*, 506 F.3d 584 (7th Cir. 2007).

The "irreparably injured" and "likelihood of success" factors comprise a "sliding scale" in which the required degree of irreparable harm increases as the probability of success decreases. *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 387-88 (7th Cir. 1984). At one end of the continuum, the moving party is required to show both a probability of success on the merits and the possibility of irreparable injury. *Id.* On the other end of the continuum, if the party seeking a stay shows that the balance of hardships tips sharply in its

favor, the party need not make a strong showing of likelihood of success; relief is warranted if the appeal presents serious legal questions. *Id.* at 388; *see also Humane Soc'y of the United States v. Gutierrez*, 527 F.3d 788, 790 (9th Cir. 2008). Accordingly, an injunction that will destroy company's market share is appropriately stayed pending appeal where the appeal presents serious legal questions.[1]

### A. myVidster's Appeal Raises Substantial Issues of Law.

"'[W]hen the request for a stay is made to a district court, common sense dictates that the moving party need not persuade the court that it is likely to be reversed on appeal.'" *Costco Wholesale Corp. v. Hoen*, 2006 WL 2645183, at *2 (W.D. Wash. Sept. 14, 2006) (citation omitted). The Court need not reject its findings to grant a motion to stay and can grant a stay even if it still believes its ruling was correct. *Zych v. Unidentified, Wrecked and Abandoned Vessel*, 1991 WL 78185 (N.D. Ill. May 3, 1991). Particularly where the balance of hardships favors the party requesting a stay, so long as substantial legal questions exist on the appeal, a stay of injunction pending appeal is proper. *See Roland,* 749 F.2d at 388 (citing *Charlie's Girls, Inc. v. Revlon, Inc.*, 483 F.2d 953, 954 (2d Cir. 1973)). myVidster more than meets this standard by being able to raise at least the following three issues, each of which is, at worst, a substantial legal question regarding the efficacy of the Court's Order and, thus, an independent ground for the grant of a stay: 1) the Order is premised on the incorrect conclusion that myVidster users are direct infringers; 2) the Order improperly presumes irreparable harm to Plaintiff; and 3) the Order's language is improperly affirmative, overbroad and vague.

---

[1] *GTE Prods. Corp. v. Kennametal, Inc.*, 772 F. Supp. 907, 921 (W.D. Va. 1991) (staying permanent injunction pending appeal when defendant "would suffer a loss of market share that it may not be able to regain"), *appeal dismissed mem.*, 988 F.2d 131 (Fed. Cir. 1993); *Advanced Med. Optics, Inc. v. Alcon Labs., Inc.*, 2005 WL 3454283, at *11 (D. Del. Dec. 16, 2005) (stay pending appeal where injunction would cause defendant to lose all its sales of infringing product), *appeal dismissed*, 197 Fed. App. 939 (Fed. Cir. 2006).

### 1. The Court's Preliminary Injunction Analysis Was Led Astray By Incorrectly Concluding that myVidster's Users Are Direct Infringers.

With respect to its analysis of myVidster's bookmarking functionality,[2] the Court based its analysis on the notion that by linking to infringing source videos, myVidster's users are direct infringers. Indeed, the Court begins its infringement analysis by stating that "*it cannot be seriously disputed that third parties have directly infringed Flava's works by posting its videos on myVidster*," and proceeds to make clear that it believes these so-called "direct[] infringe[rs]" include myVidster users that link to infringing videos hosted by third parties. *See* Mem. Op. at 14. This proposition, however – from which all of the Court's analysis flows – is directly contrary to the prevailing legal standard as established by the Ninth Circuit in *Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146, 1160-61 (9th Cir. 2007). *See e.g.,* 3-12B Nimmer on Copyright § 12B.01 (recognizing *Perfect 10* as the prevailing standard for analyzing copyright infringement in the online linking context). According to the *Perfect 10* decision, a party that links to third-party materials cannot be a direct infringer, but at most can be a contributory infringer. 508 F.3d at 1160-61.

The present case requires application of copyright law to essentially the same technology that the Ninth Circuit addressed in *Perfect 10*. Just as in *Perfect 10,* this Court correctly acknowledged that the pornographic videos in this case are "hosted on third-party websites."[3] In addition to the fact that the myVidster videos are hosted on third-party servers, the way the videos are linked and displayed is the same as in *Perfect 10*. What myVidster calls "bookmarks"

---

[2] myVidster's bookmarking functionality is the only part of myVidster's functionality still at issue in the preliminary injunction context because myVidster has voluntarily suspended its video backup functionality pending the resolution of this case.

[3] The exception to this statement is the small number of backup copies of Plaintiff's videos that are hosted on myVidster's servers. However, as noted in fn 2, myVidster's backup functionality has been suspended pending the resolution of this case and thus has no impact on the preliminary injunction analysis or this Motion.

4

are merely links of the type addressed in *Perfect 10*. *See* June Tr. at 8:17 – 9:4 (***"[A] bookmark is a link. A link is a pointer to a webpage or a file … on a website."***). They are HTML instructions that direct a viewer's browser to access a particular file at a particular location. June Tr. at 8:17 – 9:4 and 16:4 – 17:1. In the case of myVidster, they direct the viewer's browser to display a video from a third-party server. *See* June Tr. at 8:17 – 9:4 and 16:4 – 17:1 (***"…so basically those bookmarks are links, in myVidster's case, pointing to other websites around the web."***). These links are sometimes referred to as "embeds" because the video will be shown to the viewer as if it is part of the myVidster site, even though the video is hosted and displayed by the third-party server. *See* June Tr. at 16:4 – 17:1 (***"Embed is the link to the video. Basically it's a way for you to display a video that is not hosted on your website. … It is … a link to a video from another website that is playable."***). This is the same thing that the *Perfect 10* court described as "framing." *See Perfect 10*, 508 F.3d at 1157.

    The only material difference between the two systems is that whereas Google both creates and hosts links, myVidster only hosts links, leaving the creation of the links to its users. However, the Ninth Circuit addressed both of these steps in *Perfect 10*, making clear that neither the creation nor the hosting of links to infringing content can be an act of direct copyright infringement. *Perfect 10*, 508 F.3d at 1161. Therefore, myVidster cannot be a direct infringer and – more importantly for purposes of this case – myVidster's users cannot be direct infringers, as a matter of law. myVidster's users can, at most, be liable for contributory infringement.

    Once it established that myVidster's users who link to third-party videos can – at most – be contributory infringers, the entire analysis of this case must change. It cannot simply be ***assumed*** that myVidster's users are infringers because the videos to which they are linking are unauthorized. Rather, it must be ***determined*** whether these users meet the legally recognized

5

requirements for contributory infringement. And if the users are not contributory infringers, myVidster cannot be a contributory infringer for having assisted those users.

Plaintiff has offered no evidence whatsoever that any myVidster user knew that a specific source video he was linking to was infringing. There is no evidence that Plaintiff ever put a myVidster user on notice that a given source video was infringing. And there is no evidence that any myVidster user continued to link to a given source video after having been put on notice that it was infringing. Having failed to make a showing that myVidster users had the requisite knowledge to be deemed contributory infringers, Plaintiff has, by definition, failed to establish contributory infringement on the part of myVidster, let alone direct infringement.

The above analysis demonstrates not only that Plaintiff has no likelihood of success on the merits of its contributory infringement claim against myVidster, but also that myVidster is protected by certain safe harbors afforded by Section 512 of the DMCA. The Court denied myVidster safe harbor protection for failing to adopt and reasonably implement a repeat infringer policy. Mem. Op. at 21. However, when viewed in light of the legal standard provided by *Perfect 10*, it becomes clear that myVidster's repeat infringer policy is indeed reasonable.

It is axiomatic that in the context of the DMCA, "repeat infringer" refers to someone who has been legally proven an infringer. 3-12B Nimmer on Copyright § 12B.10[B][3][b] ("When Congress wished to refer to individuals who were proven infringers, it knew how to do so. It routinely prefaced references to others as "alleged infringers" or "claimed infringers." In the current context, by contrast, Congress used the term "repeat infringers" without any such qualification. ***The meaning unmistakably denoted is those against whom infringement has been established, not against whom it is merely alleged***.") As set forth above, a myVidster user can only be an infringer if it <u>knows</u> that a specific source video it is linking to is infringing. Plaintiff has offered no evidence that any myVidster user has had the requisite knowledge with

6

respect to any specific video, much less that they have done so a sufficient number of times to be deemed a repeat infringer. As discussed above, there is no evidence that Plaintiff ever put a myVidster user on notice that a given source video is infringing, and the DMCA notices sent by Plaintiff to myVidster do nothing to establish the requisite knowledge of infringement on the part of the myVidster user. Having identified no myVidster users who are infringers, much less repeat infringers, it cannot be the case that Plaintiff has demonstrated that myVidster has failed to reasonably implement a repeat infringer policy. *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007) ("***Because it does not have an affirmative duty to police its users, failure to properly implement an infringement policy requires a showing of instances where a service provider fails to terminate a user even though it has sufficient evidence to create actual knowledge of that user's blatant, repeat infringement of a willful and commercial nature***.").

Thus, contrary to the Court's assertion that myVidster is "required to investigate … notices of infringement—with respect to content *and* repeat infringers" (Mem. Op. at 22), myVidster need only appropriately respond to DMCA notices it receives. H.R. Rep. 105-551(II), at 61. The DMCA does not require myVidster to investigate a possible infringement underlying a notice. ("[T]he Committee does not intend this provision to undermine the principles of new subsection (1) or the knowledge standard of new subsection (c) by suggesting that a provider must ***investigate possible infringements, monitor its service, or make difficult judgments as to whether conduct is or is not infringing***." (emphasis added)); *see also Viacom v. Youtube*, 718 F. Supp. 2d 514, 524 (S.D.N.Y. 2010) ("***The DMCA is explicit: it shall not be construed to condition 'safe harbor' protection on a service provider monitoring its service or affirmatively seeking facts indicating infringing activity*** ....") (internal quotations and citations omitted).

Once the reasonableness of myVidster's repeat infringer policy is acknowledged, the Court should readily conclude that myVidster's linking functionality is protected by the safe

harbor contained in 17 U.S.C. § 512(d). As shown above, myVidster's linking functionality is nearly identical to Google's functionality at issue in *Perfect 10*. Indeed, when myVidster and its users are viewed together, they engage in the exact same posting and hosting of links that Google did. Just over a year ago, the Central District of California held that Google's linking functionality was eligible for the Section 512(d) safe harbor and granted partial summary judgment in favor or Google on plaintiff's claims based on the linking functionality. *Perfect 10, Inc. v. Google, Inc.*, 2010 U.S. Dist. LEXIS 75071, at *16-36 (C.D. Cal. Jul. 26, 2010). Likewise, myVidster's linking functionality is also subject to the protections of 17 U.S.C. § 512(d).

### 2. The Court Improperly Presumed Plaintiff's Irreparable Harm.

The Court also misapplied the standard for granting a preliminary injunction, as required by the Supreme Court in *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) and *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 129 S.Ct. 365 (2008). Specifically, the Court presumed plaintiff's irreparable injury and impermissibly collapsed its analysis into whether Plaintiff had shown a likelihood of success on its copyright infringement claim. Mem. Op. at 13. ("Thus, as a practical matter, the analysis boils down to a single factor – the plaintiff's likelihood of success."). However, as recognized by the Second, Ninth and Fourth Circuit Courts of Appeal, in light of the Supreme Court's rulings, "courts must not simply presume irreparable harm. Rather, plaintiffs must show that, on the facts of their case, the failure to issue an injunction would actually cause irreparable harm." *Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010). *See also Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, -- F.3d --, No. 10-35987, 2011 WL 3659315, at *9 (9th Cir. Aug. 22, 2011) (holding that "in a copyright infringement case, the plaintiff must demonstrate a likelihood of irreparable harm as a prerequisite for injunctive relief, whether preliminary or permanent"); *Perfect 10, Inc. v. Google, Inc.*, -- F.3d --, No. 10-56316

2011 WL 3320297, at *4 (9th Cir. Aug. 3, 2011) (concluding that the presumption of irreparable harm arising from showing of likelihood of success on the merits in copyright infringement claim has been "effectively overruled" by *eBay*); and *Christopher Phelps & Assoc. v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007) (rejecting that plaintiff was entitled to injunction following showing of copyright infringement and requiring affirmative showing of all four *eBay* factors).

The Ninth Circuit recently addressed this issue in *Flexible Lifeline Systems*, emphasizing that a plaintiff in a copyright infringement case must demonstrate a likelihood of irreparable harm to obtain injunctive relief, and that reliance on a presumption of irreparable harm constitutes reversible error. 2011 WL 3659315, at *10. In doing so, the court concluded that the Supreme Court's opinions in *eBay* and *Winter* have overruled previous longstanding precedent that permitted such a presumption. *Id* at. *9. The court held that plaintiffs must now affirmatively demonstrate a likelihood of irreparable harm to obtain injunctive relief. *Id*. Thus, because the district court relied solely on the presumption of irreparable harm, the court vacated the injunction and remanded the case for further consideration. *Id* at *11.

Similarly, in *Salinger*, the Second Circuit expressly held that *eBay* applies to preliminary injunctions issued for alleged copyright infringement, and vacated the preliminary injunction issued by the district court for failure to consider all four equitable factors set forth by the Supreme Court in *eBay* and *Winter*. 607 F.3d at 79-83. The court rejected the automatic presumption that a plaintiff will suffer irreparable harm upon a showing of likelihood of success on the merits, requiring instead the plaintiff to demonstrate it is likely to suffer irreparable injury. *Id.* at 80 (citing *Winter*, 129 S. Ct. at 374). The court further instructed that the analysis "must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the

remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *Id*. (quotations omitted).

Here, the Court did not consider whether Plaintiff demonstrated a likelihood of irreparable harm, but merely stated: "Irreparable injury may normally be presumed from a showing of copyright infringement." Mem. Op. at 13. (relying on pre-*eBay* decisions.). This is insufficient. Moreover, this automatic application of the presumption of irreparable harm is particularly unwarranted in this case given the only purported harm to Plaintiff is an unspecified and unsubstantiated loss of revenue, as testified to by Plaintiff's principal. May Tr. 82: 9-19 ("I don't think it's up in that number [$200,000], but I know it's more than [$]100,000). Consequently, the Order should, at a minimum, be vacated for proper consideration of this equitable principle.

### 3. The Order's language is impermissibly affirmative, overbroad and vague.

In addition to the serious questions raised above regarding the reasoning underlying the Order, the language of the Order itself violates several of the equitable canons governing preliminary injunctions. First and foremost, "Mandatory preliminary injunctions, which require defendant to take some affirmative action, represent an even more extraordinary remedy [than negative preliminary injunctions], and are cautiously viewed and sparingly issued, such that only ***the clearest equitable grounds*** will justify the remedy." *Harlem Algonquin LLC v. Canadian Funding Corp.*, 742 F. Supp. 2d 957, 960 (N.D. Ill. 2010); *Michigan v. U.S. Army Corps of Engineers*, 2010 WL 5018559 (N.D. Ill. Dec. 2, 2010); *see also Graham v. Medical Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997); *Jordan v. Wolke*, 593 F.2d 772, 774 (7th Cir. 1979); *W.A. Mack, Inc. v. General Motors Corp.*, 260 F.2d 886, 890 (7th Cir. 1958) (finding that "mandatory injunctions are rarely issued and interlocutory mandatory injunctions are even more rarely issued, and neither except upon the clearest equitable grounds"). Here, all seven

paragraphs of the Order require myVidster to take affirmative actions. However, as noted above, both Plaintiff and the Court improperly presumed irreparable harm. Indeed, Plaintiff made no attempt to show irreparable harm at the evidentiary hearing, merely relying on its principal's conclusory testimony that Plaintiff had lost revenue because of myVidster. May Tr. 45: 17-18 ("I mean, our sales are going down because people are going to the myVidster's website to view our content for free"). Reliance on a presumption and vague testimony regarding lost revenue does not constitute "the clearest equitable grounds" to justify the extensive affirmative actions required by the Order.

Second, an injunction must be "tailored to eliminate only the specific harm alleged." *Quiksilver, Inc. v. Kymsta Corp.*, No. 08-5586, 2009 WL 5184066, at *3 (9th Cir. Dec. 30, 2009). However, at the very least, paragraphs 2 and 3 of the Order fail to comply with this requirement. Paragraphs 2 and 3 require myVidster to implement broad policies for operation of the website that reach far beyond the scope of infringement alleged by Plaintiff in this case. For example, paragraph 3 states, "Implement measures designed to prevent repeat infringement." Accordingly, these paragraphs are overbroad and violate equitable principles.

Finally, a preliminary injunction must "be specific in terms" and "describe in reasonable detail ... the act or acts sought to be restrained." Fed.R.Civ.P. 65(d). "Although any injunction may present problems of interpretation, the injunction must be clear enough and specific enough to fairly apprise the enjoined party of the prohibited [or required] conduct. 'Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed.'" *American Can Co. v. Mansukhani*, 742 F.2d 314, 332 (7th Cir. 1984) (vacating lower court's preliminary injunction for being too vague in scope to pass muster under Rule 65(d), citing *Schmidt v. Lessard*, 414 U.S. 473, 476, (1974)); see also *Brumby Metals, Inc. v. Bargen,* 275 F.2d 46, 49 (7th Cir. 1960)

(court reversed an injunction, which prohibited defendant from selling furniture incorporating plaintiff's design feature "either as offered by plaintiff, or as offered in the current sales literature of Schoolco, Inc., or any variation thereof" because the language of the injunction was too vague). The language of the Order amounts to a series of broad directives that give myVidster no specific notice of what exactly it must do to comply. For example, paragraph 2 of the Order states, "Adopt and reasonably implement a repeat-infringer policy with respect to the infringement of copyright." Given that myVidster has a longstanding repeat infringer policy that was presented to the Court at the evidentiary hearing (*See* Defs. Ex. 3 at 2), it is impossible to understand what paragraph 2 is requiring myVidster to do. The other paragraphs of the Order suffer from varying but similar deficiencies. Accordingly, the Order is impermissibly vague and, as outlined above, affirmative and overbroad as well.

### B. Irreparable Harm to myVidster is Manifest: Absent A Stay, myVidster Will Be Effectively Destroyed.

The broad sweeping injunction will irreparably harm myVidster because it will force myVidster to adopt filtering functionality that will wrongly prevent users from posting content to myVidster because of a "false positive" hit for one of Plaintiff's keywords or a variant thereof and to disable accounts of users who, unwittingly or not, post infringing content more than once. Indeed, after an initial review, it appears myVidster will be forced to immediately disable the accounts of approximately **8300 myVidster users** in the absence of stay. That represents a loss of approximately 8% of myVidster's user base right away that it is unlikely to ever regain, and all because of a blunt and overreaching Order. Accordingly, the Order will have an immediate and enormous negative impact on the user experience at myVidster and permanently drive users away to competitors, destroying the market share that is critical to a fledgling website like myVidster's continued existence. This alone is irreparable harm enough to warrant a stay pending an appeal. *GTE Prods. Corp. v. Kennametal, Inc.*, 772 F. Supp. 907, 921 (W.D. Va.

1991) (staying permanent injunction pending appeal when defendant "would suffer a loss of market share that it may not be able to regain"), *appeal dismissed mem.*, 988 F.2d 131 (Fed. Cir. 1993); *Advanced Med. Optics, Inc. v. Alcon Labs., Inc.*, 2005 WL 3454283, at *11 (D. Del. Dec. 16, 2005) (stay pending appeal where injunction would cause defendant to lose all its sales of infringing product), *appeal dismissed*, 197 Fed. App. 939 (Fed. Cir. 2006).

      C.      **Plaintiff Cannot Show It Will Be Equally Harmed By A Stay.**

As outlined above and contrary to the Court's conclusion, irreparable harm cannot be presumed in this instance. *See Winter*, 555 U.S. 7, 129 S. Ct. 365, 375 (holding that plaintiffs seeking preliminary relief must "demonstrate that irreparable injury is *likely* in the absence of an injunction") (emphasis in original). Furthermore, Plaintiff has failed to show that it will in fact suffer any irreparable harm if a stay should issue. Indeed, the only harm even vaguely identified by Plaintiff has been a loss of revenue—a harm that is redressable with monetary damages and thus, per se not irreparable harm. *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 296 (7th Cir. 1997); *see also East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 703-04 (7th Cir. 2005); *see also Perfect 10 v. Google*, 2011 WL at *5 (concluding that Perfect 10 failed to establish a sufficient causal connection between irreparable harm to Perfect 10's business and Google's search engine).

Finally, Plaintiff's lack of harm is also demonstrated by its own actions. Although it was aware of myVidster since at least May 2010, it did not file this lawsuit until October 2010 and did not file for a preliminary injunction until March 2011. If Plaintiff was truly suffering irreparable harm because of myVidster, it would have not waited nearly a year to seek an injunction. *Alexander Binzel Corp. v. Nu-Techsys*, 1991 U.S. Dist. LEXIS 11915 (N.D. Ill. 1991), citing *Citibank N.A. v. Cititrust*, 756 F.2d 273, 276 (2d Cir. 1985) ("significant delay in applying for injunctive relief . . . tends to neutralize any presumption that infringement alone will

cause irreparable harm pending trial"); *see also Wolk v. Kodak Imaging Network*, 2011 WL 940056 (S.D.N.Y. 2011) ("Plaintiff's delay in bringing her motion for a preliminary injunction belies her claim or irreparable harm") citing *Salinger*, 607 F.3d at 75-76 ("an unreasonable delay suggests that the plaintiff may have acquiesced in the infringing activity or that any harm suffered is not so severe as to be 'irreparable'").

      D.      **<u>The Public Interest Favors a Stay.</u>**

The Court's imposition of direct infringement liability on myVidster's users for linking to videos potentially threatens the activities of millions of Internet users. The Court has effectively erased the line between direct and secondary liability with respect to the public display right, replacing the Copyright Act's focus on who is transmitting with a radically expansive conception that would impose direct (and hence strict) liability on anyone who, as myVidster and its users do, transmits a link and thereby "causes the appearance" of one of Plaintiff's videos. This conception is not only at odds with well-established principles of copyright jurisprudence, *see Playboy Enters., Inc. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503, 513 (N.D. Ohio 1997) ("There would be no reason to bifurcate copyright liability into the separate categories of direct and contributory if any remote causal connection to copyright infringement could be analyzed under theories of direct infringement."), but would also inflict "a tremendous chilling effect on the core functionality of the web—its capacity to link." *Perfect 10 v. Google,* 416 F. Supp. 2d at 840. No principled distinction separates myVidster's links to Plaintiff's videos from the billions of links transmitted by web publishers, libraries, bloggers, and regular internet users every day. A rule that threatens strict liability for any image displayed as a result of the transmission of a URL (whether expressed as a link, in-line link, embed, or frame) would radically change linking practices, and thereby transform the Internet as we know it. Accordingly, the Court should enter a stay of the Preliminary Injunction Order pending appeal.

**II. AT A MINIMUM, IF THE COURT DOES NOT STAY ITS INJUNCTION PENDING APPEAL, IT SHOULD AT LEAST STAY IMPLEMENTATION OF THE ORDER PENDING THE SEVENTH CIRCUIT'S RULING ON AN EMERGENCY MOTION FOR STAY PENDING APPEAL.**

If the Court denies myVidster's current Motion for a stay of the Order pending appeal, then myVidster intends to file an emergency motion with the Seventh Circuit for a stay of the Order pending appeal. Even if this Court does not stay its Order pending the appeal, then at a minimum, myVidster respectfully requests that the Court should stay its Order at least until the Seventh Circuit has had an opportunity to rule on an emergency motion regarding whether the Order should be stayed pending appeal. myVidster will commit to filing its emergency motion with the Seventh Circuit within fourteen days of this Court's Order issuing such a limited stay.

## CONCLUSION

For the above reasons, myVidster respectfully requests that this Court issue an immediate stay of the Order pending myVidster's appeal of that Order. If this Court does not stay its Order pending the appeal then at a minimum, the Court is respectfully requested to issue a stay of its Order at least until the Seventh Circuit has had an opportunity to rule on an emergency motion regarding whether the Order should be stayed pending appeal.

                                                     Respectfully submitted,

Date: September 1, 2011                /s/Gregory J. Leighton
                                                One of the Attorneys for Defendants,
                                                Marques Rondale Gunter and SalsaIndy, LLC

Kevin C. May
William J. Lenz
Gregory J. Leighton
Kathleen E. Blouin
Neal, Gerber & Eisenberg LLP
2 North LaSalle Street, Suite 1700
Chicago, Illinois 60602
312.269.8000

## **CERTIFICATE OF SERVICE**

I, Gregory J. Leighton, an attorney, state that I caused a copy of the foregoing, DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL, to be served upon the following counsel of record via the Court's ECF system on September 1, 2011:

>Meanith Huon
>Huon Law Office
>P.O. Box 441
>Chicago, Illinois 60690

>>/s/Gregory Leighton
>>Gregory J. Leighton